**Larry Dean SCHAEFER and Elaine Marie Schaefer, Debtors.**

No. 03–04001M.

United States Bankruptcy Court,
N.D. Iowa.

April 27, 2005.

Dale L. Putnam, Decorah, IA, for Debtors.

Eric W. Lam, Cedar Rapids, IA, for Trustees.

## DECISION RE: OBJECTION TO CLAIM

WILLIAM L. EDMONDS, Bankruptcy Judge.

Elaine M. Schaefer, a co-debtor, objects to the claim filed by AgVantage FS, Inc. (hereinafter "AgVantage"). Hearing on this contested matter proceeding was held April 13, 2005 in Fort Dodge. Dale L. Putnam appeared as attorney for Elaine Schaefer; Patrick C. Galles appeared as attorney for AgVantage.

This court has jurisdiction of this proceeding under 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the District Court's order of reference. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

AgVantage timely filed its proof of claim as unsecured in the amount of $86,705.27. It has filed the claim as against both debtors. Elaine objects to the claim saying

that she is not liable to AgVantage for any debt.

Larry and Elaine Schaefer, husband and wife, filed their joint petition under chapter 7 on October 20, 2003. At the time of filing they listed their occupations as managers of GRD Investments, L.L.C., but in the past, they have farmed. Larry was the primary operator, making most of the decisions regarding financing and marketing.

At some point, no later than the mid–1990s, Schaefers began financing their crop production and obtaining their crop inputs from and through North Central FS, Inc. located in Hampton, Iowa (hereinafter "North Central"). North Central is a cooperative. It and other FS cooperatives founded Growmark, Inc., a regional cooperative which provides services and products to its owner/member cooperatives, such as North Central. Growmark, Inc. has joined with John Deere Credit Company to found FS AgriFinance in order to provide FS customers with crop input financing.

Credit applications for crop input financing are taken by the local FS cooperative. The final decision on advancing credit, based on the application, is made by FS AgriFinance, located in Bloomington, Illinois. Based on the evidence and inferences therefrom, I find that notwithstanding the decision-making authority of FS AgriFinance, line of credit loans are made to the farmer customer by the local FS cooperative company, such as North Central. The FS local cooperative companies are cyclical lenders, as they provide a line of credit for a particular crop production period. The line of credit supports purchases of seed, fertilizer, and other farm chemicals purchased from the local FS cooperative. Financing also may include advances for the payment of cash rents. The loans are not revolving lines of credit. The loans relate to a particular crop year, are secured by the crop, and must be paid off by a date certain, or when the collateral security is sold.

Lori Miller, who is presently assistant controller of Three Rivers, FS Company, testified that accounting practices are consistent throughout the FS cooperative companies. There are standardized billing statements. Miller testified that if a farmer borrower failed to pay off his or her loan, it might affect the FS credit decision for the following year. Two factors affecting a subsequent lending decision would be the original amount of the loan and the amount of the delinquency. The final decision would depend on the relevant circumstances. Miller testified that if a farmer failed to pay an open account, it would be set up on a note separate from the financing note for the next production year.

On December 15, 1995, Schaefers submitted a "Line–of–Credit Application" to North Central for farm input financing for 1996 (Exhibit 1). Schaefers' contact at North Central was Eugene Heilskov, the credit manager. Schaefers requested $185,000.00 in financing. The balance sheet portion of the application showed debts to North Central and to FS Credit Corp. among Schaefers' liabilities. Money to pay these debts was not included in the itemization of the $185,000.00 loan request. On January 10, 1996, Schaefers signed a "Line of Credit Note and Security Agreement" (Exhibit 2). It was signed also by Heilskov. The amount of the payment obligation was typed as $185,000.00 in words and numerals. The numbers on the exhibit, but only the numbers, were crossed out in the amount of $185,000.00 and the figure of $194,200.00 was written in by hand. There was no explanation of the change. Neither Schaefers nor Heilskov signed or initialed the note as to the change.

On June 24, 1997, Schaefers submitted a "Line–of–Credit Application" to North Central for the 1997 crop year (Exhibit 3). On the balance sheet portion of the application, Schaefers listed their operating loan balance to North Central in the amount of $105,000.00. They applied for a line of credit of $140,000.00. The debt to North Central was not included in the amount of money requested in the loan application. On June 25, 1997, Schaefers signed a promissory note for $140,000.00 based on the application (Exhibit 3A).

At that time, North Central maintained two accounts for its customers/borrowers. These were a regular account and a deferred account. This was true for Schaefers. Charges to the regular account were made for purchases for which the product or service had been delivered and for which payment was due. The balance of the regular account drew interest at 19.8 per cent per year. Charges to the deferred account drew interest at any agreed rate or did not draw interest at all. This account would include purchases charged to the account but for which payment was not yet due. Such charges would not draw interest until a specified date or a date of delivery of product or service. Other items in the deferred account would include items for which special payment terms had been established. If there were a note and security agreement calling for a specific rate of interest, charges to the note would be put in the deferred account. The credit manager, the general manager and the controller of the local cooperative had the authority to determine transfers between the regular and deferred accounts.

On the line-of-credit notes and security agreements, it was FS policy to require both husband and wife to sign the applications and notes. This was so even if the wife were not farming. Accounts were identified in the name of the primary obligor. The monthly statements issued by North Central on Schaefers' deferred and regular accounts bore only the name of Larry Schaefer. This was so for the earliest statements located by AgVantage and offered into evidence. These statements date back to January 31, 1997 (Exhibit A, page 75). An examination of the accounts statements reveals that when amounts or balances were transferred between accounts, they were described as "payments," but for the check number designation, North Central showed them as "transfers." *See, e.g., id.* at 72–73. If the Schaefers paid money to reduce either the regular or the deferred account balance, their check number appears to have been identified (*see id.* at 42, 53).

On July 31, 1997, Schaefers had a deferred account balance of zero (*id.* at 62) and a regular account balance of $127,379.22 (*id.* at 59–61). At the beginning of November 1997, the regular account balance was $142,000.89, and the deferred account balance remained at zero (*see id.* at 54–55).

During November 1997, Schaefers made charges to the regular account for gasoline and heating oil in the amount of $994.25 (*id.* at 54) and on November 28, 1997, North Central transferred the previous balance of $142,000.89 from the regular account to the deferred account (*id.*). On December 31, 1997, a payment on the account was made in the amount of $60,000.00 by check number 2583. Larry Schaefer testified that this payment was made by Elaine from grain she had sold. She testified that she made the payment, but that she does not recall where the funds came from. The payment reduced the balance on the deferred account to $82,000.89 (*id.* at 53). Elaine Schaefer testified she made no purchases from North Central after December 31, 1997. A month later, on January 31, 1998, the

deferred account balance was $82,000.89 (*id.* at 52).

On February 27, 1998, Larry Schaefer met with Eugene Heilskov about line-of-credit borrowing for 1998. They filled out an application (Exhibit 4) which showed Elaine as a co-applicant. The balance sheet portion of the application did not show any debt to North Central, although at the time the Schaefers owed North Central at least $82,000.89 on the deferred account (*see* Exhibit A at 51). The application requested $25,000.00 in credit for 1998 (Exhibit 4 at 2). Under the marketing plan, Larry Schaefer showed a reduction in acres to 200, all owned by him. Schaefer did not fill out an informational section of the application which asked 10 questions requiring "yes" or "no" answers and explanations. One of the questions was whether any applicant was a defendant in any pending lawsuit (Exhibit 4, page 2, section 3).

Larry Schaefer testified that he met with Heilskov in order to get money to pay cash rents for the 1998 farm year and to get money to finance the farm operation. Schaefer testified that he discussed with Heilskov the submission of the application only in Larry's name. Schaefer testified that Heilskov knew that Larry had a legal dispute with Land O'Lakes regarding a hedge-to-arrive account, that he was being sued, and that he was going to trial shortly. Schaefer said they discussed the possibility that Schaefers would file chapter 12 bankruptcy if he lost the lawsuit. Schaefer said they also discussed that Elaine, who was not being sued by Land O'Lakes, did not want to farm anymore, and that Larry would be farming solely in his own name. Only Larry Schaefer signed the application. He testified that it was mostly Heilskov's idea that Elaine not sign the application or the note.

On March 2, 1998, Heilskov filled out a "Line of Credit Note and Security Agree-ment" for a new loan (Exhibit 5). The security agreement granted North Central a security interest in growing crops and described land owned by Schaefer and by landlords Clarence Clark and Julie Broers. The note was for $140,000.00 (id.). The note provided a signature line for Elaine Schaefer, but it was signed by only Larry Schaefer and Heilskov (id.). There was no testimony to explain why the note varied in significant amount from the application for credit or why the note granted a security interest in crops on rented land despite the fact that the application did not indicate that Schaefer would rent any land in 1998.

Schaefer testified that when he and Heilskov signed the note, it meant the credit application had been approved. He was to farm only in his own name. He said it was the intent of the application and note to "roll" the Schaefers' remaining debt from the 1997 crop year into the note, that the 1997 note would be paid in full, and that Elaine would have no obligation for the 1998 note or the 1997 component of the 1998 note. Schaefer says that the difference between the $140,000.00 amount of the note and the balance due from 1997 would be the money available to him to farm in 1998. Schaefer says it was the ordinary course of business with North Central to roll the previous year's balance into the note for the following year.

Schaefer says that monies were advanced on the 1998 note. He points to the deferred account statement dated February 28, 1998 (Exhibit A, page 51). He says that the statement shows that North Central advanced $10,279.83 to him on February 18, 1998. He says he believes that was advanced to pay cash rent. Schaefer does not know to whom the money was paid, but he believes it was to the Clark brothers and that North Central paid these landlords directly. He did not have any

documents to substantiate the amount of the entry as corresponding to any obligation to pay cash rent. He blames the loss of records by North Central for the lack of documentation.

Land O'Lakes obtained judgment against Larry Schaefer. He said that the outcome of the lawsuit prevented him from continuing farming in 1998. He said he learned of the judgment somewhere from March 9 to 11, about a week to ten days after signing the note. He did not farm in 1998 after the judgment entered. Schaefer says his rented land was farmed by his sons.

Eugene Heilskov, the North Central credit manager, remembers the transaction differently. He testified that he took the credit application from Schaefer but that the credit determination would be made, as usual, by FS AgriFinance in Bloomington, Illinois. This was true in 1998, as in the years prior. Heilskov denies it was his idea or decision not to have Elaine sign the application or note. He said it was company policy to have spouses of farmers sign these. Heilskov testified that he submitted the documents to FS AgriFinance because he understood that Larry did not want Elaine on the application or the note. Heilskov said it was not "his call" to make. The decision on accepting the application and note from Larry only was up to FS AgriFinance. He said he signed and submitted the note to save time because spring farming was impending and Larry wanted to get started farming.

Heilskov said that FS AgriFinance rejected the application. He does not remember the reason. Notification of rejection is normally by letter. Heilskov does not recall such a letter, but he believes that he did receive one. Heilskov testified that in filling out the application and note for 1998, he had no intention that Elaine would be released from the balance of the

debt for 1997. He says he would not have the authority to provide such a release. Heilskov testified that the entry for $10,279.83, referred to as a rent advance by Schaefer, was more likely for fall field work and this would have been advanced, if at all, under the 1997 note. Exhibit 23, prepared by Lori Miller, covers the period from September 1, 1997 to August 31, 1998. The bottom section of the exhibit shows two entries dated December 31, 1997. The first is for finance charges in the amount of $3,841.56. The second is for miscellaneous receivables in the amount of $6,438.27. These two entries total $10,279.83, the identical amount of the account entry of February 18, 1998 (Exhibit A, page 51). I find that the latter entry was not for cash rent advanced on the application for credit submitted on February 27, 1998. The timing of the loan application and the transfer of funds to the deferred account was merely a coincidence.

Also, to support her contention that the 1998 credit application was approved, Elaine points out that product was purchased in May 1998. She refers to exhibit 23 which shows entries for bulk Frontier and nitrogen solution. But these are offsetting entries which do not have the effect of an advance of credit. The net effect of the relevant section of exhibit 23 is a credit for hi-boy custom work in the amount of $391.50. The date of the credit is October 16, 1997, much prior to the date of the 1998 loan application.

After February 28, 1998, there were few changes to the accounts. On December 29, 1998, a payment was made in the amount of $1,365.00, reducing the balance of the deferred account to $81,547.66 (Exhibit A, page 42). Interest was charged on August 22, 2000, but it was added to the regular account (*id.* at 21). On January 31, 2001, the interest charge was moved from the regular account to the deferred

account, increasing the latter account's balance to $86,705.27 (*id.* at 11–12). This is the amount of the proof of claim.

Heilskov made trips to Clear Lake to discuss collection of the debt with Larry. He did not meet with Elaine. Heilskov lost his position with North Central in September 2001. Duckworth & Beerup, certified public accountants for North Central, sent audit letters to Larry, but not Elaine, requesting confirmation of the debt and the amount due (Exhibits 7 and 8). Drew & Miller, attorneys for North Central, sent a collection letter to Larry only on August 29, 2001 (Exhibit 9).

Elaine filed a chapter 11 bankruptcy petition on October 29, 1999 (Exhibit 10). In her schedules she did not list North Central as a creditor (id.). She testified that no one representing North Central has contacted her requesting payment of the debt. She was not told by anyone why she did not need to sign the note and credit application in 1998. She does not recall discussing the matter with her husband. Larry says that he told her that he had applied for credit solely in his name, that the credit line had been approved and that the 1997 loan balance had been rolled into the 1998 note. Larry says that North Central's account statements are difficult to read and he has trouble understanding them.

Effective September 1, 2002, North Central merged into AgVantage FS. Schaefers filed their chapter 7 joint petition on October 20, 2003. AgVantage does not object to Elaine Schaefer's standing to object to its claim. Elaine contends that the trustee may recover sufficient assets on her account to provide her with distribution if the claim of AgVantage is disallowed.

### Discussion

 AgVantage filed its proof of claim against the debtors in the amount of $86,705.27. "A proof of claim executed and filed in accordance with [the Federal

Rules of Bankruptcy Procedure] shall constitute prima facie evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f). The proof of claim is allowed unless an entity objects to it. The burden of proof is on the objector to show that the claim may not be allowed because of an exception set out in 11 U.S.C. § 502(b)(1)-(9). *Dove–Nation v. eCast Settlement Corp. (In re Dove–Nation)*, 318 B.R. 147, 152 (8th Cir. BAP 2004). If the objector presents evidence supporting an objection, the ultimate burden of persuasion shifts to the claimant to establish its claim. (*Id.*).

Elaine Schaefer's objection that she does not owe the debt because of an agreement between Larry and North Central falls within the exception of 11 U.S.C. § 502(b)(1). Elaine contends that the 1997 debt for which she was jointly liable was extinguished by a renewal of the debt by Larry solely in his own name. She contends that the agreement was a novation or substitute contract.

 The Iowa Supreme Court would characterize the argument as one for the existence of a substituted contract, not a novation. *Klipp v. Iowa Grain Indemnity Fund Board*, 502 N.W.2d 9, 11 (Iowa 1993). A substituted contract is one that is accepted by the obligee in satisfaction of the obligor's originally existing duty. It discharges the original obligation, and breach of the substituted contract does not allow the obligee to enforce the original obligation. *Id.* Existence of a substituted contract is not easily established and must be proven by the party asserting it by clear and satisfactory evidence. *Id.* Elaine must show (1) a previous valid obligation to AgVantage, (2) agreement of all the parties to the new contract, (3) extinguishment of the old contract, and (4) the validity of the new contract. *Id.*

 "The intention of the parties controls whether the underlying obligation is

forgiven upon the execution of the parties' new agreement." *Nash Finch Co. v. Corey Dev., Ltd.,* 669 N.W.2d 546, 549 (Iowa 2003).

■ The parties do not dispute that there was an existing valid obligation. It was the promissory obligation of the 1997 note from Larry and Elaine Schaefer to North Central. Elaine's first hurdle is to prove by clear and satisfactory evidence that there was a new agreement between Larry and North Central. This she has failed to prove. On February 27, 1998, Larry applied for credit for the 1998 crop year. He requested $25,000.00 of credit. Elaine contends that the evidence shows that Eugene Heilskov, on behalf of North Central, suggested that only Larry apply for the 1998 line of credit. She contends that three days later the loan was approved because Heilskov signed the promissory note along with Larry.

Elaine argues that the note could not be signed by Heilskov without its having been approved by FS AgriFinance. Heilskov testified, however, that he signed the note and submitted it to FS AgriFinance to speed up the application process because Larry wanted to get started with spring farming. Heilskov testified he had no authority to approve the loan only in Larry's name. He recalls the application was rejected, although no one can produce documentary evidence of a formal rejection.

The evidence is insufficient to find that FS AgriFinance, on behalf of North Central, accepted the offer to borrow money represented by the application and note. The note does not conform to the request for credit. The Schaefers' prior debt is not shown in the application. The application shows no plan to rent farm ground, although the note grants a security interest in crops grown on leased land. Elaine did not sign the note, although it shows her as a borrower. It was company policy to require the spouse of an individual

farmer to sign the note and security agreement. There is no evidence that FS AgriFinance agreed to the line of credit. Elaine's only bit of evidence is Heilskov's signature on the note, and that is explained by Heilskov as merely subject to the approval of FS AgriFinance. Moreover, there is no evidence that North Central ever disbursed any money on the note. I find that the $10,279.83 transferred to the deferred account in February 1998 was not on account of the alleged contract. Neither were the purchases referred to by Larry. Based on all the evidence, I find and conclude that the 1998 promissory note had no force or effect. The credit application was rejected by FS AgriFinance, and therefore never became an enforceable contract between Larry Schaefer and North Central.

■ Even if the 1998 line-of-credit note had been agreed on by the parties, the evidence is not clear and satisfactory that the new note extinguished the old. I disagree with Elaine's argument that the prior year's note balance was always rolled into the next note. The loan applications never included the balance of the current note in the Schaefers' request for credit for the following year. Thus there is nothing on the face of the loan application for 1998 which shows that Larry Schaefer was requesting that the 1998 credit be used to extinguish the balance of the 1997 debt and that the effect of granting the application was to release Elaine from her 1997 loan obligation. Elaine has offered no argument why North Central would have any incentive so to release her.

I conclude that Elaine Schaefer has failed to prove by clear and satisfactory evidence a valid, existing obligation between AgVantage and Larry Schaefer which extinguished her contractual obligation to AgVantage. AgVantage has met its burden of proof to show a valid claim

against Elaine and Larry Schaefer in the unsecured amount of $86,705.27.

IT IS ORDERED that Elaine Schaefer's objection to the claim of AgVantage FS, Inc. is overruled. The claim of AgVantage FS, Inc. is allowed as an unsecured claim against the debtors. Judgment shall enter accordingly.